## SCHWARTZ and another *against* The Insurance Company of North America.

*Philadelphia, Monday, July 25.*

If the general agent of ship and cargo, covers enemy property on board, the warranty of neutrality in a policy on the ship, is violated.

THIS action was brought by *I. F. Schwartz* and *A. I. Schwartz* who survived *William M'Fadon*, on a policy of insurance for 20,000 dollars made the 19th *January* 1807, on the ship *Margaret* valued at 25,000 dollars, at and from *Batavia* to *Baltimore*, with the usual liberty of touching and trading for refreshments, warranted *American* property, proof to be made in *Baltimore* only, premium 7½ per cent. In the order for insurance, it was mentioned that the ship sailed under a sea letter or certificate, and that her cargo outwards *consisted partly or in the whole of articles contraband of war.*

The cause was tried before the Chief Justice in *November* last, when the following facts were in evidence.

The *Margaret*, belonging to the plaintiffs and *William M'Fadon* deceased, who were *American* citizens, sailed from *Baltimore* on her outward voyage in *March* 1804, laden principally with gunpowder and other contraband articles. She arrived at the *Cape of Good Hope* in *May*, where some of the articles not contraband were disposed of, and those which were contraband were carried in the ship to the *Isle of France*, where she arrived in *July*. She was there detained by an embargo for a considerable time, and at length sailed for *Batavia* the latter end of *November*, having disposed of the remainder of her cargo, including the contraband, to the agent of the *French* government on a long credit, and having received an advance of 12,000 dollars specie, from *Buchanan* and *Bickham* on account of the debt due from the

*French* government. The object of the voyage to *Batavia*, was to take in a cargo of coffee and sugar, with which a certain *Detmar Smith* had promised to supply them, and to receive payment in bills on *Baltimore*. In *January* 1805, they arrived at *Batavia*, where they found neither a cargo nor the probability of getting one in a short time. *William M'Fadon*, one of the owners of the ship, had gone out in her as master, with full powers to manage her concerns, and those of the cargo. Finding no likelihood of getting a cargo shortly, he made an arrangement with *Christian Lewis Arnold*, a *Dutch* merchant residing at *Batavia*, for a trading voyage to *Tranquebar*, a *Danish* settlement on the coast of *Coromandel*. *M'Fadon* left the ship in charge of *John Deshon* the mate, with provisional orders that in case of his sickness, the command should devolve on *Samuel Heard*, who had originally been assistant supercargo; and he authorized *Heard* by power of attorney, to manage the concerns of the cargo. He himself went from *Batavia* in *February* 1805 to the *Isle of France*, returned to *New York* in *January* 1806, and died before the commencement of this suit.

*Deshon* was taken sick, and *Heard* came into the full management of ship and cargo. He made two voyages to *Tranquebar*, in partnership with *Arnold*, the first of which was prosperous, and the last not so. In *August* 1806, having returned to *Batavia* from his second voyage to *Tranquebar*, *Heard* wrote to his owners under date of 30th *August*, that he expected his return cargo to *Baltimore* consisting of sugar and coffee, would amount to 50,000 dollars. Afterwards under date of 9th *November* 1806, he wrote that the return cargo would probably amount to 73,000 dollars, and requested insurance to be made accordingly. On the 19th *December* 1806, he wrote, that having taken a considerable part of the cargo on board, the ship sprung a leak, in consequence of which the cargo was unladen, and the ship repaired at a very heavy expence. *Heard*, in order to raise money, as he deposed, for these repairs, entered into a written agreement with *Arnold*, by virtue, as he therein stated, of a power of attorney from the plaintiffs, by which it was agreed that *Arnold* should advance money for the repairs of the ship, and also, if necessary, for payment of the plaintiffs' one half of that part of the cargo in which they and *Arnold*

1814.

SCHWARTZ
et al.
v.
INS. COMPANY
of
N. AMERICA.

were equally concerned, viz. coffee, sugar, and pepper, to the amount of 50,000 dollars or thereabouts, for which *Heard* was to give his bills on the plaintiffs with an advance of 28 per cent. The rest of the cargo belonged to *Arnold;* but in order to cover it from *British* capture, the whole cargo was apparently to belong to the plaintiffs; and to make the deception more complete, *Heard* gave his bills to *Arnold* for 30,000 dollars, the amount of that part of the cargo which belonged to *Arnold*, under an express understanding that the bills were not to be paid. To make *Arnold* secure, the ship, cargo, and insurances, were hypothecated to him.

In *March* 1807, the ship sailed from *Batavia* bound to *Baltimore*, having *Arnold*, his daughter, and six slaves on board as passengers. *Arnold* died on the passage. On the 8th *July*, the ship was captured by a *British* letter of marque, on suspicion of the cargo's being *Dutch* property. *Heard* at first declared that the whole property belonged to the plaintiffs, according to the ship's papers; but the *British* captain having discovered some papers that led to the discovery of *Arnold's* partnership, and some of the crew having declared that they believed *Arnold* to be interested, *Heard* produced the written agreement with *Arnold*, and confessed the truth.

The ship was carried to *Trinidad;* but there being no court of admiralty in that island, proceedings were instituted in the Court of Vice Admiralty of *Barbadoes*. *Heard* entered a claim for the ship and that part of the cargo which belonged to the plaintiffs, but both ship and cargo were condemned as enemies' property or otherwise &c., with the exception of the property of *Heard*, and the adventures of the mariners. The reasons assigned by the judge for the condemnation were, that the homeward voyage was but a continuation of the outward, and was the result of an adventure commencing in contraband; or if the continuity of the voyage had been broken by the trading from *Batavia*, then by that trading and the residence of *M'Fadon* at *Batavia*, he had acquired a *Dutch* character, and the vessel had become an adopted *Dutch* ship. *Heard's* adventure he restored, in consequence of what was called his candor in disclosing the true interests.

The plaintiffs heard of the capture on the 30th of *August*

1807, and on the next day, directed their agents in *Philadelphia* to abandon, which was accordingly done.

These are all the facts that were material; and upon them the Chief Justice explicitly charged the jury, that the warranty of *American* property had been violated, and the risk of the voyage increased, by the improper conduct of the plaintiffs' agent, and therefore that they were not entitled to recover. The jury found a verdict in conformity with the charge, and the cause came now before the Court, upon a motion by the plaintiffs for a new trial.

1814.
SCHWARTZ
et al.
*v.*
INS. COMPANY
of
N. AMERICA.

*J. R. Ingersoll* and *Dallas* for the plaintiffs. By the order of insurance the defendants knew that the *Margaret* carried contraband on the outward voyage; and therefore all the consequences of that fact, were within their contemplation. They knew that as the cargo belonged to the same owners, the ship was liable to capture and condemnation. The *Ringende Jacob* (*a*), 2 *Azuni* 415, *British Order of* 24*th June* 1803, *Chitty* 318, 126. If therefore she was met by an enemy, the event which actually occurred must have been foreseen, and it was encountered by the defendants for the premium which they received. The condemnation then having been on the very ground of contraband, and that ground having been disclosed and the risk assumed by the underwriters, it is merely a refinement to attempt to protect them from liability by setting up a breach of the warranty of neutrality. But in reality there has been no such breach. The conduct of the agent did not forfeit any of the neutral rights of the ship, nor expose the underwriter to any inconvenience or risk that he did not undertake to bear. A neutral ship has an unquestionable right to carry enemy property. *Vattel book* 3. *ch.* 7. *s.* 115. *Vrow Henrica* (*a*). If met upon the ocean, the captor has an equal right to take her in. If she is rightfully taken in, she is not entitled to costs or expenses in consequence of the detention. *Chitty* 318., 4 *Inst.* 22., *Bynk. Quest. Jus. Pub. book* 1. *ch.* 14. These are legal results from the fact of carrying enemies' property; and there are no other inconveniences from covering it, since it is perfectly well settled, that the ship is not forfeited because the agent of the owner has used false papers to skreen

(*a*) 1 *Rob.* 74.                    (*b*) 4 *Rob.* 282.

1814.

SCHWARTZ
et al.
*v.*
INS. COMPANY
of
N. AMERICA.

the cargo. The extent of the forfeiture is the freight, to which the underwriters would not be entitled, if it were allowed. *Chitty* 301, 303, 328. The covering is beneficial to the underwriter on ship, because without involving the property in a new peril, it protects it from one that is actually impending. The fraud in its consequences is confined to the cargo. In the present case there was no animadversion by the judge of vice admiralty upon the false papers; he does not notice it as an ingredient in the cause; on the contrary he restored the adventure of the captain, in consequence of the fairness of his conduct. No instance can be found in which the *ship* has been brought into jeopardy, except for illegality in her own conduct, or fraud in her own documents; and the sole object of the warranty was the vessel, her documents and conduct.

*Hopkinson* and *Levy* for the defendants. This cause was formerly tried before Judge *Washington*, whose opinion being decidedly against the plaintiffs, they suffered a non suit when the jury were at the bar. The plaintiffs' argument is partly founded upon a fallacy, partly on a misapprehension of the law. It is fallacious to put the case upon the communication of the contraband; because if the underwriters knew or supposed the ship might be condemned for that cause, which from the amount of premium it is clear they did not, it would not follow that they were to bear all or any other risks, which the misconduct of the assured might lead to. Nor is the cause of the condemnation of the slightest moment, though if it be material as to part, it is so as to the whole; and the judge himself did not say whether it was contraband or *Dutch* adoption, that had the most influence on his sentence. The latter was certainly justified by the facts, and there is no pretence for saying they were disclosed to us. The adoption alone was a breach of neutrality. The *Vigilantia* (a), 1 *Chitty* 56.

The true objections to the recovery are, 1. The breach of the warranty by covering enemies' property; 2. The increase of the risk by the same cause.

1. The warranty of neutrality stipulates for neutral pro-

(a) 1 *Rob.* 10.

perty, neutral conduct, and neutral protection. To carry enemies' property is lawful; to skreen it by false papers, and false declarations, is unlawful. It is taking part with one enemy against the other, contrary to the obligations of neutrality. It is prostituting the mantle of a friend to disguise and shelter an enemy. To state it, is sufficient to shew that it is unneutral conduct. The authorities are full to the point. *Pratt* v. *Phœnix Ins. Co.* (a), *Blag* v. *New York Ins. Co.* (b), *Calbraith* v. *Gracie* (c), *Rich* v. *Parker* (d), *Parkin* v. *Dick* (e). And it is a matter of no moment, whether the loss is occasioned by the unneutral conduct or not. 1 *Marsh.* 348, *Park* 318. If the agent of the ship perpetrates the wrong, his principal loses his indemnity. 2. The risque was increased; for although a vessel may be legally taken in if she carries enemy property openly, although she may be detained and costs not allowed to her, yet she is not subject to be libelled herself, under that suspicion which a fraud in one part of the adventure casts upon the whole, she is not subject to the same extent of delay, and above all she *is not exposed to pay costs*, which is part of the risk that always attends unneutral conduct, and would infallibly have been inflicted as a penalty in a case so gross as this. *Chitty* 318, 303, 304. There are other points in the cause, particularly the hypothecation to *Arnold;* but this is decisive.

TILGHMAN C. J. This is an action on a policy of insurance on the ship " *Margaret*," on a voyage at and from *Batavia* to *Baltimore*, warranted *American* property. In the order for insurance it was mentioned, that the ship sailed under a sea letter, and that her cargo *out*, consisted partly or in whole of articles contraband of war.

The cause was tried before me, and the jury agreeably to my charge gave a verdict for the defendants. There was a great deal of evidence, and many points of law were discussed; but the charge and the facts necessary to explain it may be reduced to a narrow compass. [The Chief Justice then stated as much of the case as was material.]

On these facts, I directed the jury to find for the defendants, being of opinion, that the warranty of " *American*

---

(a) 2 *Binn.* 324.    (c) 1 *Marsh.* 406.    (e) 2 *Campb.* 223.

(b) 1 *Marsh.* 406.    (d) *Id.* 409.

"*property*," was violated, and the risk of the voyage increased by the improper conduct of the plaintiffs' agent.

By a warranty of *American property*, it is understood, not only that the ship belonged to an *American* citizen at the time of the insurance, but should continue so during the voyage; and that the captain and agents of the owners should conduct themselves conformably to the laws to which neutrals are subject. A neutral may lawfully carry the goods of one belligerent, subject to the right of capture by the other. The captor takes the goods paying freight to the carrier if he has acted fairly. But where the neutral, not content with carrying, undertakes to cover the cargo by false papers and false oaths, he violates the duties of neutrality as well as morality; he takes part in the war by favouring one belligerent, and attempting to defraud the other. In answer to this, it is said that the underwriters have no reason to complain, because having been informed, that part of the outward cargo consisted of contraband articles, they knew that the ship was liable to condemnation. If they did know that she was subject to condemnation, it is strange that they should insure her at a premium of seven and an half per cent. It is more probable, that considering the length of time between the commencement of the outward voyage and the underwriting of the policy, it was supposed that the taint of contraband was purged. But be that as it may, the question is not whether the underwriters were like to be injured by the breach of the warranty, but whether the warranty was broken; for if it be, the policy is vacated, though the ship were lost by a peril unconnected with the warranty.

The plaintiffs rely much on the distinction between *ship* and *cargo*. The fraud say they, was confined to the cargo, and therefore could not be visited on the ship. This is so far true, that according to modern usage, the ship is not condemned for the fault of the cargo, except in the case of articles contraband of war, which condemn the ship, if they belong to the owner of the ship. But although the ship be not condemned for the carriage of goods of an enemy, yet when the captain conducts himself fraudulently, heavy expenses may be incurred. The owner of the ship is subject to those expenses; he will be allowed no costs, and in gross cases, he will even be made to pay costs. Now

1814.

SCHWARTZ
et al.
v.
INS. COMPANY
of
N. AMERICA.

if the warranty is not broken, he has a right to recover those costs and expenses of the insurer. Besides, it is probable that the ship will be subject to more *delay*, when these fraudulent practices are discovered by the captor, than if all was fair. When it is found that the cargo is covered, suspicions will arise as to the *ship;* hence a more strict scrutiny and rigorous prosecution may be expected. So that in fact, the risk of the insurer is increased, though the ship be not subject to confiscation. My sentiments on this subject are strengthened by the opinion of the Circuit Court of the *United States* for this district. The plaintiffs first commenced their action there, and suffered a *non pros.* at bar, after hearing the charge of the Court against them. My opinion is against a new trial.

YEATES J. The present motion for a new trial is founded on a supposed misdirection of the Court upon the trial to the jury, that the insured had been guilty of a breach of warranty expressed in the policy, and therefore not entitled to recover in this action. All the circumstances of the case from the period of the ship *Margaret's* sailing from *Baltimore* to the *Cape of Good Hope*, in *March* 1804, to the time of instituting the suit, have been fairly and minutely detailed by the Chief Justice in his charge, which I will not again repeat. I shall content myself with observing, that the order to make insurance on the return voyage from *Batavia* to *Baltimore*, dated 19th *January* 1807, stated, "that the " ship's cargo *outwards* consisted partly, or in whole of " articles *contraband of war*," and that the policy on the ship, pursuant to the order, contained a warranty that " she " was *American* property, of which proof to be made in " *Baltimore* and not elsewhere."

When the plaintiffs institute their cause in this Court, and the inquiry into the observance of the warranty becomes indispensably necessary, the insured must be supposed to admit that the proof must be had here. How otherwise could the suit be tried on its merits? That the *property* in the vessel was in truth and in fac *American*, in the common acceptation of the terms, there can be little room to question; and if the case depended on that construction of the warranty, we cannot doubt what ought to be the result. But

1814.

SCHWARTZ
et al.

*v.*

INS. COMPANY
of
N. AMERICA.

the legal extent of this warranty, and the fair *commercial import* of the words used, must govern our decision in this instance.

*American* here means *neutral* property, in contra-distinction to *belligerent*. Now it is fully settled, that the meaning of such a warranty is not only that the subject insured shall be the property of neutral persons, but that it shall be neutral for all the purposes of being protected. The vessel must be navigated according to the laws of nations, and be furnished with every document proper to evince such neutral character. No anti-neutral papers on board should compromit her asserted neutrality. The agents of the insured as well as the insured themselves, should do nothing in violation of the rules laid down by civilized nations for the conduct of neutrals. It cannot be said, that a concerted system of deception, studiously calculated to defeat the known rights of one of the belligerent nations, and false papers covering enemies' property, sealed with perjuries, can be deemed conformable to the correct conduct of neutrals.

It has however been contended by the plaintiffs' counsel, that the acts of captain *Heard*, however exceptionable as to the cargo, could not increase the risk of the underwriters on the *ship*, inasmuch as they were fully informed that she sailed from *Baltimore* on her *outward* voyage with contraband goods on board, which was a sufficient ground of condemnation both of ship and cargo, whatever change the original goods underwent in the course of her different voyages, under the modern doctrine of *continuity*. I answer that it is not material whether the breach of the warranty conduced to the loss, or not. The warranty is a condition precedent, which not being complied with, the contract of indemnity is thereby dissolved; and the correct conduct of neutrals being precisely ascertained by many judicial decisions, it is equivalent to that line of conduct being particularly expressed in the policy. In the case of the *Phœnix Insurance Company* v. *Pratt & Clarkson*, 2 *Binney* 324, it was held by this Court unanimously, that an attempt to mask goods under a neutral cover, was a breach of neutrality, and that the owners of a ship were responsible for the conduct of their captain who must be considered as their agent. Admitting that the carrying goods contraband of war into an enemy's

port, would condemn the ship and cargo, and that the cover-
ing of belligerent property by the neutral vessel under false
papers, would only condemn the property of the enemy,
when it can be separated from what is *bona fide* neutral,
what follows from hence? Shall the insured or his agents
multiply hazards on the underwriters, which they never
agreed to run? Shall the latter be subjected to other risks
than those expressed in their contract of insurance, although
of an inferior grade? The taint of contraband had infected
the outward cargo so early as *March* 1804; but there would
be no reasonable grounds to suspect the existence of that
fact, when the *Margaret* was taken by the *Dominica Packet*
on the 8th of *July* 1807. Unless some suspicious circum-
stances occurred, which tended to awaken the recollection
of the first illicit voyage, it might have passed into oblivion
so far as respected the *captors*. This appears not only pro-
bable to me, but to be the very truth of the case. The *Mar-
garet* arrived at *Port d'Espagne*, in the island of *Trinidad*,
on the 19th of *July* 1807. Within three days afterwards it
appears by the record of the Court of Vice Admiralty, that
certain depositions were taken by *Archibald Gloster* Esq.
commissioner of the Prize Court of *Barbadoes* resident in
*Trinidad*. Upon the 22d of *July*, *James Cowill*, commander
of the *Dominica Packet*, made oath, that he boarded the
*Margaret*, and detained her on suspicion of the cargo on
board being *Dutch property*, and belonging to the enemies
of the *United Kingdom* of *Great Britain* and *Ireland*. *Andrew
Arenstep* chief mate of the *Margaret*, on the 24th of the
same *July*, in answer to the third interrogatory, made oath
that the *Margaret* was captured on suspicion of being *Dutch*
property; and captain *Samuel Heard* on the day following,
made the like answer to the same interrogatory, and to the
thirteenth interrogatory he said, that the bills of lading for
the cargo then on board, in asserting it to be *American* pro-
perty, were not true, inasmuch as part of it belonged to
*Christian Louis Arnold*. In his deposition taken in the action
in the Circuit Court on the 1st of *November* 1808, and read
by consent in this cause, captain *Heard* swore, that after the
capture and detention of his ship, information was given to
the *British* by the crew and people on board, that they had
carried out contraband, and that they believed the ship and

1814.

SCHWARTZ
et al.
v.
INS. COMPANY
of
N. AMERICA.

cargo to belong to *Arnold.* These particulars satisfy my mind, that unless the vessel and cargo had been suspected in the first instance to have been enemy's property, she would not have been sent in for adjudication, and therefore the masked property materially tended to the injury of the underwriters.

I desire to be understood as concurring throughout in the charge of the Chief Justice. I adopt his expressions; " although it be granted that it is not usual to condemn a " ship, even where the cargo has been covered by fraudu-" lent papers, yet the fraud is punished by withholding " freight and costs, and in gross cases by *payment of costs.* " If costs are paid or even withheld, the risk is plainly in-" creased, because if the insurance stands good, the assurer " must indemnify the assured against such costs." Independently however of the increase of risk, I have already said, that if the defendants had either by themselves or their agents, been guilty of a breach of their warranty of neutrality, they are not entitled to recover.

I am of opinion that the motion for a new trial be denied, and the judgment be entered for the defendants on the verdict.

BRACKENRIDGE J. It seems to have been made out by the counsel for the plaintiff, so far as I can see without further examination, that *hypothecation* does not affect the neutral character of a ship; that it would not be a breach of a warranty of neutrality; and that the carrying belligerent property does not affect the neutral character of the ship. If so, that could not be a breach of the warranty of neutrality. It seems also to have been made out, that *covering belligerent property* can affect the cargo only, not the ship. But the *discovering* the *covering* might lead to a stricter examination, and produce a discovery of something else, that might be *a cause of the condemnation of the ship.* But that cause to which such examination might lead was known to the assured, and the risk of it was taken on themselves. This was the having carried contraband of war on a voyage out, and before the voyage insured had commenced. This was the cause of the condemnation of the ship in question. The question then will be, the insurers having taken

the risk of the carrying out contraband of war, it being known to them, and therefore to be considered as excepted out of the insurance, was the voyage insured to be considered stript of this circumstance, and to be as if it had not existed? I cannot say that I can otherwise construe it. If so, the *carrying belligerent property or covering it*, even though it did increase the risk of discovering *this taint of the vessel*, yet it did not increase the *stain* for which *the vessel was condemned*. A great deal has been said, and much may be justly argued on the subject. But the inclination of my mind on hearing the argument of counsel, and which I thought very able on both sides, was for the plaintiff. I am shaken doubtless, by the opinion of others against me; but I am not prepared to concur in an opinion for the defendant.